UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HISTORY ASSOCIATES INCORPORATED,

        Plaintiff,

v.

U.S. SECURITIES AND EXCHANGE COMMISSION,

        Defendant.

Case No. 1:24-cv-1858-ACR

**STATUS REPORT**

Coinbase (through History Associates) commenced this FOIA case to bring the SEC's secretive policy shifts on crypto into the sunlight.  But the SEC revealed to the world just days ago that the agency has forever stymied public investigation of these issues by flouting FOIA's mandates and destroying key documents.  The SEC's Office of Inspector General ("OIG") published on September 3 a report detailing how the SEC has *excluded* SEC officials' text messages when processing FOIA requests even though many of them constitute agency records subject to FOIA.  The report also reveals that nearly a year's worth of the text messages of then-SEC Chair Gary Gensler were *destroyed* in September 2023—after these FOIA requests were filed, but long before litigation began.  And it shows that more than 20 other high-ranking SEC officials' texts may also now be lost to history and that dozens more have been or may be at imminent risk of erasure.  Although the SEC has known of these glaring and urgent problems for two years, none of this was disclosed to this Court or History Associates during 14 months of litigation.

The SEC OIG's findings bear directly on this case.  History Associates' FOIA requests and this Court's orders encompassed *all* "communications" of Gensler and other top SEC officials on

crypto-related topics. Yet the SEC has now revealed, in response to repeated inquiries from History Associates, that the agency initially failed to search *any* of its officials' text messages and did not conduct even limited searches of texts until April and June 2025—long after purporting to have complied with an order of this Court, years after the FOIA requests were submitted, and after critical text messages may have been destroyed in the interim.

The SEC cannot credibly claim "no harm no foul" simply by having run thirteenth-hour searches. The agency says those searches produced no results, but by the SEC's own admission, the searches may not have captured all text messages of all relevant officials—which may be in danger of imminent destruction. More fundamentally, the SEC's search comes far too late: Any texts destroyed *before* the agency ran its searches could not have been found.

The SEC's record of defiance demonstrates why prompt compliance with FOIA's mandates is critical: If an agency does not promptly search for and disclose relevant records, it runs the risk that they will be lost or destroyed—as countless text messages were here. That risk was realized in this case. Had the SEC conducted prompt, proper searches when History Associates submitted its requests in July and August 2023—before Gensler's texts were destroyed—the agency could have reviewed and processed those records then, or at least taken steps to preserve them. Instead, the agency improperly blanket-denied History Associates' FOIA requests without even looking for those potentially responsive records, and now they may be lost forever.

Making matters worse, the SEC then proceeded to drag its feet at every stage of this case. It has sought multi-*year Open America* stays and attempted to extend Court-imposed deadlines even though the agency has been aware for *more than two years* (but never informed the Court) that Gensler's texts had been deleted and other top SEC officials' texts were at risk of deletion. It may be impossible to reconstruct how many responsive texts have been irretrievably lost due to

the SEC's stonewalling and what critical information will never see daylight as a result. But what *is* certain is that the SEC's destroy-and-delay approach to records must end immediately.

The SEC has imposed *more than a billion* dollars in fines on private parties for failures to preserve securities-related text messages and similar communications within the last few years alone. And in doing so, the agency has emphasized that "everybody should play by the same rules" and be held "accountable for violating … time-tested record keeping requirements." SEC Press Release No. 2021-262 (Dec. 17, 2021), https://tinyurl.com/58vfveue. To ensure that the SEC is held to its own standard—and to prevent the destruction of additional records—the Court should hold a hearing and order appropriate relief, including an expedited proper search for and production of any relevant texts that the agency's tardy, limited searches did not uncover, discovery to get to the bottom of the agency's spoliation, and all appropriate sanctions.

I.  **Coinbase Filed This Lawsuit To Try To Uncover The SEC's And Former Chair Gensler's Views About Digital Assets**

Coinbase filed the FOIA requests at issue in this case in July and August 2023 to try to shed light on the SEC's views on the how securities laws apply to digital assets, including Ether ("ETH"), which is used on the Ethereum blockchain. *See* ECF 1. The SEC responded by issuing blanket denials of those requests under Exemption 7(A), rather than searching for and reviewing all responsive records as FOIA requires. After History Associates filed this suit in June 2024, the SEC all but abandoned Exemption 7(A) and claimed that it needed an additional *three years* even to begin to conduct the FOIA review that it should have done at the outset before acting on the requests. ECF 19 at 1; ECF 20 at 3.

This Court rejected that proposal and instead has issued multiple orders directing the SEC to prioritize the processing of four important subparts of Ethereum-related records while the parties negotiate over the remaining records:

| Subpart | Description |
|---|---|
| Subpart 1 | All documents and communications that former Chair Gensler sent, received, or considered concerning Ethereum's shift to a proof-of-stake mechanism. |
| Subpart 2 | All documents and communications sent by the SEC to third parties regarding Ethereum's shift to a proof-of-stake mechanism. |
| Subpart 3 | All documents and communications sent to or by certain high-level SEC officials (including former Chair Gensler) that discuss or analyze whether Ether is a security or whether transactions in Ether are securities transactions, and that contain certain keywords. |
| Subpart 4 | All documents or communications sent to or by certain high-level SEC officials (including former Chair Gensler) related to or concerning the decision to close the ETH 2.0 investigation. |

Three of the four subparts seek the communications of former Chair Gensler, and two seek the communications of other top SEC officials. The Court directed the agency to produce subparts 1 and 2 within sixty days during a November 2024 hearing. ECF 24-1 at 18. After obtaining an extension, the agency purported to complete that production on January 28, 2025. The SEC responded to the remaining subparts (including re-runs of subparts 1 and 2 to correct deficiencies in the initial production) by June 6, 2025. None of the documents produced or the accompanying *Vaughn* indices included text messages, and the agency never gave any indication that it had searched text messages.

II.  **A Recently Issued Report By The SEC's Office Of Inspector General Finds That The SEC Has Deleted Potentially Responsive Text Messages And Failed To Fulfill Its FOIA Obligations**

On September 3, 2025, the SEC's OIG released a report titled *Special Review: Avoidable Errors Led to the Loss of Former SEC Chair Gary Gensler's Text Messages*, https://www.sec.gov/files/sec-oig-review-587-2025.pdf ("OIG Report" or "Report"). The OIG Report—which focuses on the agency's deletion of nearly a year's worth of then-Chair Gensler's text messages—contains several troubling findings about the SEC's past and present data-retention practices and its failures to comply with FOIA.

4

***The SEC permanently deletes then-Chair Gensler's text messages***. The report begins by explaining that, nearly a decade ago "[t]o comply with federal records requirements," the agency implemented a "Capstone" data-retention program under which the agency permanently retains the communications of "about 200 Capstone officials." OIG Report 2. These officials include "the Chairman, the Commissioners, and their staff" and "the agency's division directors, their deputies, and their chief counsels," among others. *Id.* at 2 n.11. In 2022, the SEC expanded the Capstone program to retain Capstone officials' text messages. *Id.* at 2. "As part of this effort," the SEC's Office of Information Technology "provided SEC's Capstone officials with new mobile devices and retained their old devices for recordkeeping purposes." *Id.*

But that data-retention program went badly awry. In September 2023, "the agency erased nearly a year's worth of text messages sent and received by the then SEC Chair, Gary Gensler." OIG Report i, 4. The deletion purportedly resulted from the implementation of a "new, admittedly aggressive" agency policy of remotely wiping mobile devices that had ceased communicating with the SEC's network for at least 45 days. *Id.* at 4-5 (quotation marks omitted). Then-Chair Gensler's phone became disconnected from the network for more than 45 days, was remotely wiped per the new policy, and then was hastily factory-reset by agency IT officials. *Id.* at 4. That resulted in the deletion of all of Gensler's texts from between October 2022 and September 2023, *id.* at 15—a critical period during his tenure at the agency in which the FTX crypto exchange collapsed and the SEC launched a blizzard of enforcement actions against crypto companies, including Coinbase.

In the following months, the SEC unsuccessfully attempted to recover the missing texts "through forensic means" and then collected texts from certain third parties with whom Gensler communicated. OIG Report 12. But the agency's search was incomplete. The agency collected smartphones from "a list of 34 agency employees with whom [Gensler's staff] predicted he texted

5

most frequently," but "Gensler did not provide input into the list, and the original list did not include his fellow Commissioners." *Id.* Additionally, although the SEC was supposed to regularly back up Capstone officials' phones, "[m]ost SEC Capstone officials' text messages had not been backed up since October 2022," including Gensler's. *Id.* at 3, 6. In other words, the SEC had no failsafe if its most senior officials' text messages (many of which are SEC records) were deleted.

The OIG later conducted additional searches (including the texts of other Commissioners), but it "was unable to conduct an independent forensic examination of the smartphone because OIT returned it to the vendor on January 8, 2024, before the OIG was notified of the incident." *Id.* at 12 & n.22. As a result, the OIG was "unable to recover or determine the entire universe of missing text messages." *Id.* at 12.

***The OIG finds many substantive communications among the deleted texts***. As part of its investigation, the OIG reviewed approximately 1,500 Gensler texts that were recovered from third parties. OIG Report 13. Based on that review, the OIG concluded that "the majority" of those texts—and thus likely most of the missing texts as well—are "SEC records" for purposes of federal records laws. *Id.* 13-14. Moreover, although "Gensler and his staff" had told investigators that "he usually texted for administrative reasons," *id.* at 12, that is in fact false. The OIG "determined that around 38 percent of the recovered text conversations were mission related and concerned matters directly involving SEC senior staff and/or Commissioners at the time." *Id.* at 13. The topics discussed included a "May 2023 conversation involving Gensler, his staff, and the Director of the Division of Enforcement about when the SEC would be filing an action against certain crypto asset trading platforms and their founder"; a "June 2023 conversation with a Commissioner concerning a proposed Division of Enforcement settlement with a leading global financial services

6

firm"; and discussions in May 2023 regarding Gensler's upcoming speeches on various topics including "crypto." *Id.* at 14.

***The OIG finds that dozens of other senior SEC officials' texts may have already been or imminently be destroyed***.  The OIG Report also recounts that the SEC recently reported to the National Archives and Records Administration "the potential loss of federal records from 21 devices" belonging to other SEC officials.  OIG Report 8, 21.  And the report explains that the agency has been "unable to successfully back up the mobile devices used by about 40 other Capstone officials." *Id.* at 7.  As a result, "the text messages stored on these SEC devices are at greater risk of loss or may have already been lost." *Id.*  It is unclear what steps, if any, the agency has taken to remedy these issues.

***The OIG finds that the SEC did not search for texts responsive to FOIA requests***.  The OIG Report also finds that the SEC has repeatedly failed to search text messages that may be responsive to FOIA requests.  According to the OIG, the SEC's Office of Information Technology ("OIT") "only searches text messages when FOIA Services specifies that texts should be searched."  OIG Report 16.  "Therefore, although FOIA requests are to be interpreted broadly, whether OIT performs these searches could depend on a FOIA specialist's determination of whether 'all emails or other communications' or similar request language includes text messages." *Id.* (footnote omitted).  "Internal FOIA guidance did not clearly state how to interpret a request for a broad term such as 'communications,'" and the OIG identified "one matter where a FOIA specialist interpreted a request for 'all emails or other communications' as *not* to include text messages." *Id.* at 16.  The OIG also found multiple instances in which Gensler's "text messages were not searched" in processing "FOIA requests submitted after September 6, 2023, to which Gensler's

lost text messages could have been responsive … even though 'all emails or other communications' and 'any communications' were requested." *Id.*

The OIG further found that the SEC failed to notify FOIA requesters when their requests implicated Gensler's deleted texts. OIG Report 16-17. "Federal regulations require that FOIA Services notify a requester" if a responsive record "'has previously been destroyed.'" *Id.* at 17 (citing 17 C.F.R. § 200.80(e)(2)(iii)). But "[b]ecause no text message searches were performed for the closed matters [the OIG] reviewed, there was no adverse determination triggering the requirement to notify requesters." *Id.*

### III.  The SEC Appears To Have Violated FOIA And This Court's Orders

The SEC OIG's findings give rise to serious concerns about the agency's conduct in *this* case and raise urgent questions the SEC has been unable to answer. Most immediately, the OIG Report calls into doubt the SEC's compliance with orders this Court has issued in this litigation to partially remedy the agency's original sin of issuing a blanket denial of History Associates' FOIA requests without actually reviewing the withheld records. The Report further shows that significant harms already caused by the SEC's initial FOIA violation are now irreparable and that its data-handling deficiencies pose an immediate risk of further injury. And the SEC's failure to disclose to History Associates or to this Court any of these shortcomings—including destruction of documents that occurred after all of the FOIA requests were submitted and before this suit was commenced—illustrates an alarming lack of transparency from the SEC.

#### A.  The OIG Report And The SEC's Response To It Show That The Agency Violated At Least One Court Order And May Have Violated Others

Over the past 10 months, this Court has repeatedly ordered the SEC to produce targeted subsets of records responsive to History Associates' original FOIA requests. Although the SEC

8

has purported to comply with those orders, the OIG Report and the SEC's responses to History Associates' questions about the Report suggests otherwise.

The plain terms of the relevant subparts that the Court has ordered the SEC to produce cover text messages. Each of the three subparts that concerns the SEC's internal communications encompasses "*all* documents and *communications*" sent to or by specified SEC officials on specified topics. ECF 21-1; ECF 27 at 3 (emphases added). Subpart 1 covers "all documents and communications that SEC Chair Gary Gensler sent, received, or considered concerning Ethereum's shift to a proof-of-stake mechanism." ECF 21-1. Subparts 3 and 4 similarly encompass "[a]ll documents and communications" (or "[a]ll documents or communications") "sent to or by" high-level SEC officials addressing whether Ether is a security and the decision to close the ETH 2.0 investigation. ECF 27 at 3. The subparts are narrowly targeted in the substantive issues included but cover all forms of communication, including texts.

Indeed, text messages among senior officials could provide critical pieces of the puzzle that the SEC has sought to obscure. The OIG Report documents that Chair Gensler and other officials frequently communicated by text message on important issues. Although "Gensler and his staff" told investigators that "he usually texted for administrative reasons," the OIG's "review found multiple instances"—indeed, *hundreds* of text messages—discussing "substantive, mission-related communications between Gensler, his staff, his fellow Commissioners, and other senior officials." OIG Report 12-13; *supra* 6-7. And the Report offers examples demonstrating that then-Chair Gensler and his staff communicated by text about important, crypto-related matters that could be responsive to the FOIA requests at issue here—such as "[a] May 2023 conversation involving Gensler, his staff, and the Director of the Division of Enforcement about when the SEC would be filing an action against certain crypto asset trading platforms and their founder" and

9

discussions in May 2023 about Gensler's upcoming speeches on topics including "crypto." *Id.* at 14. Whatever the wisdom of senior officials' reliance on text messages to confer on such matters, their correspondence could provide a crucial window into senior SEC officials' unvarnished interactions in real time.

As discussed above, however, the OIG Report troublingly finds that the SEC does *not* routinely search officials' text messages in processing FOIA requests. *See supra* 7-8. The OIG found multiple instances, for example, where Chair Gensler's text messages "could have been responsive" to FOIA requests covering "all emails or other communications" or "any communications" but "were not searched." OIG Report 16. And the SEC's "FOIA specialists" whom it entrusts with determining whether a request requires searching texts have implausibly "interpreted a request for 'all emails or other communications' as *not* to include text messages." *Id.*

In this case, although at least three of the subparts ordered by this Court encompass texts, neither the SEC's productions nor its *Vaughn* indices to date include any text messages sent to or by Chair Gensler or other enumerated officials that could be responsive to the subparts. Nor did the agency ever indicate that it had searched any text messages. Thus, after reviewing and analyzing the OIG Report, History Associates promptly and repeatedly asked the SEC whether it has searched text messages in responding to the subparts. Ex. A at 1, 3, 4-6. The SEC eventually responded that it conducted searches of certain officials' texts (including Gensler's), but only in *April and June 2025*—months after the SEC claimed in January 2025 to have complied with this Court's order requiring the agency to produce subparts 1 and 2, and years after History Associates submitted its FOIA requests. The agency thus violated at least that order.

In an apparent effort to paper over that problem, the SEC now claims that "[n]o hits were returned" by the searches it belatedly ran in secret. Ex. A at 2. But those searches are incomplete

10

on the SEC's own telling, which calls into question the agency's compliance with this Court's later orders as well. The SEC searched only the texts of officials "who had text messages that had been processed by OIT at the time of the search." *Id.* According to the SEC, it "do[e]s not have a mechanism for searching texts that have not been processed by OIT other than by collecting and searching each employee's phone." *Id.* But the agency did not explain which officials' phones it failed to collect or why it did not attempt to collect them. *Id.* The agency also acknowledged that some of the officials whose communications may be responsive to History Associates' requests "had phones that were inaccessible" because those phones "could not be backed up as discussed in the OIG report." *Id.*; Ex. B. The agency did not identify any steps it has taken—or whether any steps could be taken at this point—to collect information from those phones.

Even for texts the agency purportedly *did* search, the keywords it used were not comprehensive and differed in material and unexplained ways from one another and from the keywords the parties had agreed upon. Ex. A at 2. For the agency's re-run of subparts 1 and 2, for example, the parties agreed in a March 2024 email exchange that the SEC would search all records containing variations of the words "ETH" and "proof of stake." *See* ECF 30-1 at 4-5. Yet its recently revealed searches of Gensler's texts show that the agency used *different* and potentially more constraining search terms for the text-message searches by adding the word "securit*" to the list of required keywords. Ex. A at 2 (searching "Eth* AND securit* AND proof of stake"). The SEC also omitted from the March 2024 email exchange that it was even searching Gensler's texts (or that any such texts existed); instead the agency listed only "Chair Gensler's Emails," his "Calendar," and his "Microsoft Teams Chats." ECF 30-1 at 4-5. The agency also never ran a standalone keyword search for "ETH 2.0" in response to subpart 4, which was focused entirely on the decision to close the ETH 2.0 investigation. *See supra* 4.

11

The agency's long-overdue and incomplete effort to backfill its prior failures to conduct complete searches in response to this Court's orders does not remotely get the agency off the hook. Especially in light of the *ongoing* risk of further loss of text messages the OIG Report identifies, the agency's apparent noncompliance with the Court's orders is of urgent concern.

### B.    The OIG Report Means The SEC's Original FOIA Violation Has Already Caused Irreparable Injury And Poses An Immediate Risk Of Ongoing Harm

The OIG Report's revelation of bulk deletion of text messages also means that the injury the SEC caused by its initial refusal to review records before denying History Associates' FOIA requests can never be fully remedied and may continue to cause harm. All three of those requests were submitted in July or August 2023—before nearly a year of former Chair Gensler's texts (and potentially more than 20 other officials') were deleted in September 2023 or later. The OIG also reports that texts may have been deleted from an additional "21 devices." OIG Report 8. Had the SEC conducted prompt, proper searches when History Associates' requests were submitted in July and August 2023—or at minimum taken steps to preserve the records it would need to search—it could have reviewed and processed those records before their destruction. But now those potentially responsive texts from dozens of SEC officials' devices may be lost forever. At least part of the harm caused by the SEC's unlawful blanket-denial approach thus can never be directly redressed.

That risk of further irreparable harm, moreover, is ongoing. The OIG Report states that the SEC has been "unable to successfully back up the mobile devices used by about 40 other Capstone officials," and that "[a]s a result, the text messages stored on these SEC devices are at greater risk of loss or may have already been lost." OIG Report 7. Unless the agency has already either searched or preserved all text messages on those devices and any others it has been unable to back up, untold numbers of potentially responsive records are in jeopardy of deletion every day.

12

### C. The SEC's Lack Of Transparency Has Exacerbated The Harms It Caused

Finally, the SEC has made matters worse by never disclosing to the Court or History Associates the serious issues discussed in the OIG Report. The deletion of Chair Gensler's text messages occurred two years ago, while History Associates' FOIA requests were still pending. And the agency reported the incident to the OIG in January 2024, OIG Report 15—months before History Associates commenced this suit in June 2024.

But the SEC never apprised the Court or History Associates that potentially responsive records (extant when the FOIA requests were filed) had been destroyed and that others were at ongoing risk of destruction. Even after the SEC purportedly ran belated searches of some text messages in April and June 2025, the agency *still* did not inform History Associates that it was doing so, let alone that its prior productions excluded text messages. The agency also failed to disclose that History Associate' requests implicated texts that may have "previously been destroyed," as its regulations require. 17 C.F.R. § 200.80(e)(2)(iii). And the agency remained silent even *after* the OIG Report was published. It took repeated emails from History Associates to get answers to basic questions about when the agency conduced its searches.

All of this comes against the backdrop of the agency's relentless efforts to delay its productions in this case. The agency sought a *years*-long *Open America* stay and requested extensions of Court-imposed deadlines without ever disclosing to History Associates or the Court that potentially responsive records might be destroyed as a result of the agency's delays. Had the SEC disclosed those developments, the Court might have ordered additional measures to prevent further loss of data.

13

## IV. This Court Should Take Remedial Steps To Ensure That The SEC Complies With Its FOIA Obligations

This Court's intervention is warranted to determine whether the SEC has in fact violated the Court's prior orders and to ensure that all available measures are taken to preserve and produce responsive records. Within 24 hours of receiving the OIG Report (and just two days after it was made public), History Associates' counsel contacted the SEC raising urgent questions about the Report's findings as they may relate to the FOIA requests in this case. Those include whether the SEC searched text messages when it produced the subparts of History Associates' requests; whether senior officials covered by subparts 3 and 4 are among those whose devices lost texts; steps the agency has taken to recover lost messages and to prevent further destruction, including the "about 40" senior officials whose devices it has been unable to back up, OIG Report 7; and why the SEC never disclosed these developments dating to September 2023 to the Court or History Associates in more than a year of litigation.

Although the SEC said it would "work to provide further information as soon as possible," Ex. A at 4, the agency took days to answer the simple questions of whether and when it searched for texts in response to History Associates' requests and the Court's orders. And its track record in this litigation portends further delay.

Given the urgency—including that "text messages stored on th[e] SEC devices" that were "used by about 40 other [SEC] officials" are at an ongoing "risk of loss," OIG Report 7—History Associates respectfully proposes that the Court convene a hearing so that the SEC can address these issues on the record. The Court will then be better positioned to determine what remedial steps are needed. At that hearing, the SEC should explain why it did not conduct a search of text messages initially in response to History Associates' FOIA requests and subparts 1 and 2. The

SEC also should be ordered to perform a complete search immediately and to produce all responsive texts to History Associates on an expedited basis. The Court should also order expedited discovery, including a 30(b)(6) deposition, into the SEC's actions, including whether the other officials included in subparts 3 and 4 lost text messages, when any such messages were destroyed (and whether the SEC's delay in searching for text messages meant any were deleted that could otherwise have been found), the specific steps the agency has taken to recover deleted messages and prevent further records destruction, and why the SEC withheld these developments.

Following discovery, the parties can then return to the Court, and the Court can determine the appropriate additional remedial measures at that time. Appropriate remedies could include, among other things, sanctions and "reasonable attorney fees and other litigation costs," 5 U.S.C. § 552(a)(4)(F)(i)—as well as "a written finding that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding," which would trigger a Special Counsel investigation "to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding." *Id.*

\*   \*   \*

The serious problems identified in the OIG Report are unfortunately not surprising in light of the SEC's history of issues with records preservation. *See Destruction of Records Related to Matters Under Inquiry and Incomplete Statements to the National Archives and Records Administration Regarding that Destruction by the Division of Enforcement*, SEC-OIG Case No. OIG-567 (Oct. 5, 2011), https://tinyurl.com/ywcksxsv; *SEC's Records Management Practices*, SEC-OIG Report No. 505 (Sept. 30, 2012) ("Not having records retention schedules for all offices and divisions … could potentially result in … discard[ing] records that should have been preserved."),

https://tinyurl.com/y6j5mkjx.  Meanwhile, the agency has aggressively pursued enforcement actions (including during Gensler's tenure) against industry actors for similar violations and imposed *more than a billion dollars in fines* within just the past few years.  *See, e.g.*, SEC Press Release No. 2024-98, *Twenty-Six Firms to Pay More than $390 Million Combined to Settle SEC's Charges for Widespread Recordkeeping Failures*, (Aug. 14, 2024), https://tinyurl.com/y62y6hpn.\*  In doing so, the SEC has emphasized that "everybody should play by the same rules" and be held "accountable for violating … time-tested recordkeeping requirements."  SEC Press Release No. 2021-262 (Dec. 17, 2021), https://tinyurl.com/58vfveue.  That includes the SEC.

---

\* *See also* SEC Press Release No. 2025-6, *Twelve Firms to Pay More Than $63 Million Combined to Settle SEC's Charges for Recordkeeping Failures* (Jan. 13, 2025), https://tinyurl.com/2b7epv4p; SEC Press Release No. 2024-144, *Eleven Firms to Pay More Than $88 Million Combined to Settle SEC's Charges for Widespread Recordkeeping Failures* (Sept. 24, 2024), https://tinyurl.com/yrh74avr; SEC Press Release No. 2024-114, *SEC Charges Six Credit Rating Agencies with Significant Recordkeeping Failures* (Sept. 3, 2024) (more than $49 million), https://tinyurl.com/3u392rbe; SEC Press Release No. 2024-18, *Sixteen Firms to Pay More Than $81 Million Combined to Settle Charges for Widespread Recordkeeping Failures* (Feb. 9, 2024), https://tinyurl.com/4vrr7357; SEC Press Release No. 2023-12, *SEC Charges 10 Firms with Widespread Recordkeeping Failures* (Sept. 29, 2023) ($79 million), https://tinyurl.com/2un8wz33; SEC Press Release No. 2023-149, *SEC Charges 11 Wall Street Firms with Widespread Recordkeeping Failures* (Aug. 8, 2023) ($289 million), https://tinyurl.com/bdsj7dkz.

Date: September 11, 2025                    Respectfully submitted,

/s/ Jonathan C. Bond
Eugene Scalia
Jonathan C. Bond
Nick Harper
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539
escalia@gibsondunn.com
jbond@gibsondunn.com
nharper@gibsondunn.com

*Attorneys for Plaintiff*